**In re the Marriage of Rosemary Ann MAURER, Respondent,**

v.

**Michael Patrick MAURER, Petitioner, Appellant.**

No. C7–99–1319.

Supreme Court of Minnesota.

March 22, 2001.

Thomas Zupanc, St. Cloud, for plaintiffs.

Kay R. Snyder, St. Cloud, for defendants.

## OPINION

PAGE, Justice.

The sole issue presented in this marriage dissolution case is whether the trial court abused its discretion when it considered future tax consequences in valuing appellant Michael Maurer's ("Maurer") retirement assets. The trial court awarded respondent Rosemary Galvin ("Galvin") (formerly known as Rosemary Maurer) property valued at $77,846 and Maurer property valued at $77,840. The award to Maurer included funds he held in three deferred compensation plans and one retirement plan. The trial court used the after-tax value of the four plans in calculating the value of the parties' marital property. The four plans had a pre-tax value of $98,406 and an after-tax value of $63,964. The court of appeals held that, because there was no evidence that a taxable event was required by the dissolution or certain to occur shortly thereafter, the trial court engaged in speculation when it used the after-tax value of the plans in valuing the marital property. *Maurer v. Maurer*, 607 N.W.2d 176, 183–84 (Minn. App.2000). The court of appeals reversed the trial court and remanded for reconsideration of the property distribution between the parties. *Id.* at 184. We reverse.

Maurer and Galvin were married on July 9, 1971, and separated in March of 1997. Maurer was 49 years old and Galvin 48 years old when their marriage was dissolved. At the time, Maurer owned the following retirement assets:

| | |
|---|---|
| State of Minnesota Deferred Comp. Plan | $ 6,377.88 |
| MSRS Deferred Comp. Supp. Investment Fund | $22,074.13 |
| Minn. Life Deferred Comp. Account | $21,841.71 |
| MSRS Termination Payment Plan | $48,112.00 |
| TOTAL | $98,406.00 [1] |

Maurer, seeking to have the trial court distribute the funds in the four plans based on their after-tax value, offered the testimony of a certified public accountant, David Hinnenkamp, to establish that value. The trial court allowed this testimony over Galvin's objection that it was speculative. Hinnenkamp testified that he regularly values assets in performing business valuations and preparing personal financial statements. He further testified that both business valuations and personal financial statements take into account the anticipated tax to be paid on an asset when it is converted to cash. According to Hinnenkamp, professional standards and generally accepted accounting principles require that current income tax rates be used to calculate the tax on these assets, as opposed to making assumptions about what the rates might be when the asset is converted to cash.

Hinnenkamp also testified that he was familiar with Maurer's retirement assets and the laws governing the taxation of those assets. According to Hinnenkamp, funds from Maurer's deferred compensation plans can be withdrawn in only four circumstances: retirement, disability, death, or an unforeseeable emergency. Hinnenkamp further testified that any funds withdrawn from Maurer's retirement assets would be subject to taxation as ordinary income, and that Maurer's combined federal and state marginal tax rate for such withdrawals would be approximately 35%. Hinnenkamp testified

---

1. This figure appears to reflect the trial court's rounding of the total value to the nearest dollar.

that an additional 10% penalty would apply to any withdrawal made from Maurer's MSRS Termination Payment Plan before Maurer reached the age of 59 1/2. Using the 35% marginal tax rate, Hinnenkamp calculated the after-tax value of the plans to be $63,964. In establishing the 35% marginal tax rate, Hinnenkamp used Maurer's 1997 taxable income and a projection of Maurer's 1998 income, in addition to assuming that Maurer's 1999 income would not fluctuate and that his other income and deductions would remain consistent. In his testimony, Hinnenkamp acknowledged that the deferred compensation plans could be divided between the parties as part of the dissolution without any immediate tax consequences to either party; that the tax laws periodically change; and that the effective tax rate would depend on the dollar amount of any withdrawal from the plans.

At trial, Maurer testified that he was "considering" cashing in his MSRS Termination Payment Plan, but that he did not know if he would. He indicated that, although he had no definite plans, he was also "thinking about" terminating his employment, which would allow him to withdraw funds from his deferred compensation plans.

The trial court found that the retirement assets would be taxable upon distribution. Applying the 35% combined federal and state marginal tax rate, the trial court also found the after-tax value of Maurer's retirement assets to be $63,964. Both parties moved for amended findings and Galvin alternatively moved for a new trial, arguing, among other things, that the trial court should not have considered future income tax consequences in valuing Maurer's retirement assets. In response to Galvin's alternative motions, the trial court stated that "[t]he evidence before the Court is that the marginal tax rate is what would apply. While it may be possible a higher tax rate could apply, no evidence suggests that a lower tax rate would apply." Although the trial court amended its findings, it denied Galvin's motion for a new trial and did not change its findings with respect to the value of Maurer's deferred compensation and retirement plans.

On appeal, the court of appeals reversed, holding that the trial court's consideration of the 35% marginal tax rate was speculative because there was no evidence presented at trial that a taxable event was required by the dissolution or certain to occur shortly thereafter. *Maurer,* 607 N.W.2d at 183–84. The court of appeals remanded with instructions that the trial court "revisit the property settlement because the consideration of the tax consequences rendered the division of property inequitable." *Id.* at 184.

## I.

■ A trial court has broad discretion in dividing property upon dissolution of a marriage. *E.g., Rutten v. Rutten,* 347 N.W.2d 47, 50 (Minn.1984). Determining the specific value of an asset is a finding of fact. *Hertz v. Hertz,* 304 Minn. 144, 145, 229 N.W.2d 42, 44 (1975) (per curiam). "Such findings of fact, when made without a jury, shall not be set aside unless clearly erroneous on the record as a whole." *Id.* Such broad deference is appropriate because "valuation is necessarily an approximation in many cases." *Id.* Accordingly, the value arrived at by the trial court need only fall "within a reasonable range of figures." *Id.*

Galvin contends that the trial court's consideration of tax consequences here constituted impermissible speculation under a line of this court's cases beginning with *Aaron v. Aaron,* 281 N.W.2d 150 (Minn.1979). In essence, Galvin argues that *Aaron* and its progeny establish a bright-line rule that, unless a taxable event is either required by or likely to occur shortly after the dissolution, the consideration of future tax consequences is speculative and impermissible. Maurer argues that the *Aaron* line of cases does not establish such a bright-line rule. According to Maurer, those cases merely establish

that, where no evidence of tax consequences has been introduced, a court engages in speculation by considering tax consequences.

We have, on several occasions, addressed the issue of whether a trial court may consider future tax consequences when dividing marital property in marriage dissolution cases. *See Aaron,* 281 N.W.2d at 153; *Miller v. Miller,* 352 N.W.2d 738, 744 (Minn.1984); *O'Brien v. O'Brien,* 343 N.W.2d 850, 854 (Minn.1984); *Johnson v. Johnson,* 277 N.W.2d 208, 213 (Minn.1979). In *Aaron,* the appellant husband was awarded a 25% interest in certain apartment properties. 281 N.W.2d at 152. He argued that the trial court erred by failing to consider that he would have to pay significant capital gains taxes when the apartment properties were sold. *Id.* at 152–53. We stated that it was within the trial court's discretion to consider the tax consequences of its award. *Id.* at 153. At the same time, we expressed our agreement with cases from other jurisdictions that " 'the court is not required to speculate about what either or both of the spouses may possibly do with his or her equal share and therefore to engraft on the division further adjustments reflecting situations based on theory rather than fact.' " *Id.* (quoting *In re Marriage of Fonstein,* 17 Cal.3d 738, 131 Cal.Rptr. 873, 552 P.2d 1169, 1175 (1976)). We then observed that the husband failed to show that he needed or intended to sell his interest in the properties. *Id.* We also noted that the husband testified that the properties were a long-term investment and would probably not be sold until fully depreciated. *Id.* We held that, in light of this evidence, the trial court did not abuse its discretion when it refused to consider the possible tax consequences upon the sale of the properties. *Id.*

We added, however, that we were not holding "that in a proper case, where sale of real estate is required or is likely to occur within a short time after the dissolution, that the court should not consider tax consequences—indeed it should." *Id.* at 153. Galvin argues, and the court of appeals agreed, that this language from *Aaron* establishes that only two situations permit a court to consider future tax consequences—when a sale of the property is either required or certain to occur within a short time of the dissolution. *Maurer,* 607 N.W.2d at 183; *Hattstrom v. Hattstrom,* 385 N.W.2d 332, 336 (Minn.App.1986); *Brockman v. Brockman,* 373 N.W.2d 664, 666 (Minn.App.1985). In fact, that is not what we held in *Aaron.* Nor have any of our subsequent cases so held. To have so held would have been inconsistent with our recognition that "it is within the trial court's discretion to consider the tax consequences of its award." *Aaron,* 281 N.W.2d at 153; *Miller,* 352 N.W.2d at 744; *Johnson,* 277 N.W.2d at 213. Such a bright-line rule would leave little, if any, room for the exercise of discretion.

Moreover, our analysis in *Aaron* did not turn upon the husband's failure to satisfy a bright-line rule, but rather upon the evidentiary record and our standard of review. The husband in *Aaron* simply failed to introduce evidence at trial that rendered the trial court's refusal to consider the future tax consequences of its award an abuse of discretion. Our decisions in *O'Brien* and *Miller* similarly demonstrate that our concern in *Aaron* was speculation in the form of reliance on generally insufficient evidence rather than with determining whether a bright-line rule had been met. *O'Brien,* 343 N.W.2d at 854 ("[T]he law precludes any consideration where the court must speculate because the evidence is lacking or nonspecific."); *Miller,* 352 N.W.2d at 744 ("The court must have sufficient information that the actual tax liability resulting from the property division can be calculated with a reasonable degree of

certainty."); *see also Johnson,* 277 N.W.2d at 213 (finding no error in trial court's refusal to consider tax consequences "where no evidence on the issue was presented at trial").

A bright-line rule is also inconsistent with our pronouncements that property "valuation is necessarily an approximation in many cases, and it is only necessary that the value arrived at lies within a reasonable range of figures." *Hertz,* 304 Minn. at 145, 229 N.W.2d at 44; *see also Johnson,* 277 N.W.2d at 211 (noting that "[e]xactitude is not required of the trial court in the valuation of assets in a dissolution proceeding"). We note that other jurisdictions are divided on the question of whether a trial court may consider future tax consequences. Courts in some jurisdictions have held that the consideration of future tax consequences in valuing retirement assets is too speculative because tax rates are subject to change.[2] Courts in other jurisdictions, however, have concluded that such uncertainty is outweighed by the fact that, while the tax rate that will actually be applied to a retirement asset may be unknown, it is practically certain that the asset will be taxed.[3] As one court

aptly put it, "[b]ecause it is a virtual certainty that [the owner] will not receive his retirement [assets] free of income tax liability, the only question is what the probable tax liability will be." *Alexander,* 742 P.2d at 64. We find this reasoning persuasive. It is also important to note that retirement assets such as Maurer's deferred compensation and retirement plans have little or no real value until the funds within them are withdrawn, which, ironically, is the event that triggers their taxation. We therefore conclude that it would be inequitable to preclude a trial court from considering future tax consequences when the trial court has a "reasonable and supportable basis for making an informed judgment as to [the] probable liability." *Id.*

## II.

Having rejected the notion that *Aaron* and its progeny created a bright-line rule, we must now determine whether the trial court abused its discretion when it valued Maurer's deferred compensation and retirement plans using their after-tax value. Testimony at trial established that it is proper to consider future income taxes when valuing assets; that professional

**2.** *See Wilkins v. Wilkins,* 111 N.C.App. 541, 432 S.E.2d 891, 897 (1993) (holding that the trial court erred in considering hypothetical tax consequences because to predict variables including the government's tax structure, plaintiff's financial condition, and the date of plaintiff's retirement several years into the future "requires the trial court to engage in impermissible speculation"); *Hovis v. Hovis,* 518 Pa. 137, 541 A.2d 1378, 1380, 1381 (1988) (reversing the trial court's deduction of 10% of the value of certain stock and a pension plan because the trial court could not reasonably predict future tax liability "because tax rates constantly change").

**3.** *See Dodson v. Dodson,* 955 P.2d 902, 909–10 (Alaska 1998) (concluding that the trial court did not abuse its discretion by acknowledging that the transfer of a 401(k) plan to the wife also shifted a tax liability to her, or by applying a 31% marginal tax rate, stating, "[a]lthough the precise magnitude of the tax liability may be unpredictable * * * [the wife] would have to pay deferred taxes on the

401(k) plan before she could use the plan's funds"); *Day v. Day,* 40 Ohio App.3d 155, 532 N.E.2d 201, 205–06 (1988) (concluding that, although the tax consequences at the time the husband withdraws funds from his retirement plan are too speculative to be ascertained, "the trial court properly could apply the present tax rates in considering the tax consequences" because, "[g]iven the current tax rates, we cannot say that the rates applied by the trial court are unreasonable, even if they be the highest applicable rate"); *In re Marriage of Alexander,* 87 Or.App. 259, 742 P.2d 63, 64 (1987) (concluding that, where the husband presented expert testimony that funds withdrawn from his retirement account would be taxed between 35% and 45%, the trial court properly considered tax consequences because, "[a]lthough the amount of the tax liability frequently cannot be determined with complete certainty, the expert testimony in this case provides a reasonable and supportable basis for making an informed judgment as to [the] husband's probable liability").

standards and generally accepted accounting principles require that current income tax rates be used to calculate future income taxes; and that the lowest combined federal and state income tax rate that would apply to Maurer's retirement assets is 35%. The record further reflects that the 35% rate is based on the following: Maurer's 1997 income; his projected 1998 income; the assumption that Maurer's 1999 income would not fluctuate; and the assumption that Maurer's other income and deduction items would remain consistent.

Galvin argues that, because the 35% tax rate was calculated using mere anticipations and assumptions, the rate is speculative. Ultimately, this argument goes to the question of whether the trial court had a "reasonable and supportable basis for making an informed judgment as to [the] probable liability." *Alexander*, 742 P.2d at 64. Specifically, the question we must now answer is whether the 35% tax rate used in calculating the value of Maurer's retirement assets caused the trial court's valuation to fall outside a "reasonable range of figures." *Hertz*, 304 Minn. at 145, 229 N.W.2d at 44. Based on the record before us, we conclude that it did not. The testimony provided by Maurer's expert, Hinnenkamp, provides support in the record for the 35% marginal tax rate. There is no evidence in the record suggesting that some lower rate would be more appropriate. Indeed, the parties made no effort to have the trial court consider a lower rate. While it may be that evidence could have been produced supporting application of a lower marginal tax rate, no such evidence was offered at trial. Because the trial court's valuation did not fall outside a "reasonable range of figures," we hold that the trial court did not abuse its discretion.

Because we hold that the trial court's consideration of future income tax consequences in valuing Maurer's deferred compensation and retirement plans was not rendered speculative in that a taxable event was not required by or likely to occur within a short time after the dissolution, and that the trial court did not abuse its discretion when it applied the 35% marginal income tax rate in valuing those plans, we reverse the court of appeals.

Reversed.

LANCASTER, Justice (concurring).

I concur with the result reached by the majority. I write separately to emphasize that the decision is based upon the facts of this case, and does not represent a departure from the general rule that tax consequences may not be taken into account when to do so would be speculative. *Aaron v. Aaron*, 281 N.W.2d 150, 153 (Minn. 1979); *Miller v. Miller*, 352 N.W.2d 738, 744 (Minn.1984); *O'Brien v. O'Brien*, 343 N.W.2d 850, 854 (Minn.1984). Restricting consideration of tax consequences to events that are likely to occur within a short time of the dissolution is a safeguard against unfair speculation. Although I am not convinced the consideration of future tax consequences in this case resulted in an equitable distribution of assets, I concur in the result because the record is lacking in evidentiary support for application of a lower tax rate, which may well be appropriate in many retirement situations.

BLATZ, Chief Justice (concurring).

I join in the concurrence of Justice Joan Ericksen Lancaster.

RUSSELL A. ANDERSON, Justice (concurring).

I join in the concurrence of Justice Joan Ericksen Lancaster.